COMMONWEALTH vs. ROBERT ANTHONY DIPIETRO.

Worcester.    April 5, 1977. — September 19, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, WILKINS, & ABRAMS, JJ.

*Constitutional Law,* Confrontation of witnesses. *Evidence,* Previous testimony of unavailable witnesses, Transcript of testimony. *Practice, Criminal,* Mistrial, Exceptions: failure to save exception. *Witness,* Unavailability, Privilege. *Words,* "Unavailable."

At the trial of indictments in the Superior Court, returned following a probable cause hearing in a District Court at which the defendant's girl friend was a reluctant prosecution witness and was fully cross-examined, where it appeared that she had married the defendant four days before being called as a witness at the trial and was present and exercised her privilege under G. L. c. 233, § 20, Second, and refused to testify against the defendant, the admission in evidence of the transcript of the testimony of the witness at the probable cause hearing did not violate any rights of the defendant under the confrontation clauses of either the United States or the Massachusetts Constitutions [375-380]; the circumstances by reason of which the witness's testimony was "unavailable" to the Commonwealth at the trial entitled it to introduce the transcript of her prior testimony as an exception to the hearsay rule [380-386].
The defendant's motion for a mistrial in a criminal case, presented on the morning after a witness took the stand and a procedure was adopted to which the defendant made no objection and took no exception and which was followed by the testimony of two other witnesses, was not seasonably filed, and the appeal from the denial of the motion brought nothing to this court for review. [386-388]
The procedure followed at the trial of indictments, after the prosecutor was informed that his principal witness at the probable cause hearing, then the girl friend of the defendant, had married him and would, if called to the stand, exercise her privilege under G. L. c. 233, § 20, Second, not to testify against him, did not violate any rights of the defendant where it appeared that upon the prosecutor's calling the witness to the stand there was a bench conference, that on a voir dire in the absence of the jury and later in the presence of the jury the witness stated that she did not want to testify against the defendant, that the judge ruled that she did not have to do so, that no further attempt was made to question the witness, and that the judge instructed the jury that a wife could not be compelled to testify against her husband. [388-391]
At the trial of indictments before the 1975 amendments to G. L. c. 221, § 91B, and c. 233, § 80, the complete and accurate transcript of testi-

mony at a probable cause hearing of a witness, then the girl friend of the defendant, prepared by a stenographer provided by him at his own expense was properly admitted in evidence where, although the transcript did not qualify for admission under c. 233, § 30, it appeared that after the hearing the witness had married the defendant and at the trial exercised her privilege not to testify against him [391-394]; without foundation in the record and without merit were the defendant's contentions that he was denied a fair trial by reason of the stenographer's testimony before the jury that she had mailed her stenographic notes to the defendant's counsel, and that the notes were inadmissible as "a work product" [394-395].

Where it appeared at the trial of indictments that a stenographer's notes of the testimony of a witness at the probable cause hearing were admissible in evidence but that the stenographer had turned them over to the defendant's counsel, it was not error for the judge to order the notes produced in the presence of the jury after giving the defendant ample opportunity to do so without an order, and his declining.  [395-396]

INDICTMENTS found and returned in the Superior Court on January 17, 1975.

The cases were tried before *Ronan, J.*

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Conrad W. Fisher* (*Alfred B. Cenedella, III*, with him) for the defendant.

*James P. Donohue,* Asistant District Attorney (*Edward P. Ryan, Jr.,* with him) for the Commonwealth.

QUIRICO, J.  The defendant was indicted for the unarmed robbery and first degree murder of Harold F. Lowell. The two indictments were tried together before a jury which returned verdicts of guilty of robbery and of manslaughter. The defendant appealed to the Appeals Court under G. L. c. 278, §§ 33A-33G, and that court confirmed the conviction on each indictment. *Commonwealth* v. *DiPietro,* 4 Mass. App. Ct. 845 (1976). The defendant then applied to this court for further review on four specific issues which are set out in the margin, and we allowed the application.[1] G. L. c. 211A, § 11.

---

[1] The application for further review read in part as follows:

"The Defendant raises the following points with respect to which further appellate review of the decision of the Appeals Court is sought:

"1. Whether the Appeals Court erred when it ruled that the exercise

Commonwealth *v.* DiPietro.

The four issues on which the defendant requested, and we granted, further appellate review relate solely to the trial judge's admission in evidence of a transcript of testimony which had been given at a probable cause hearing in a District Court on two complaints charging the same crimes later charged in the indictments on which the defendant was convicted. The witness was Marianne Belanger who had married the defendant four days before she was called as a witness at the trial of the indictments in the Superior Court, and exercising her privilege under G. L. c. 233, § 20, Second, refused to testify against her husband.

Although the defendant's application for further appellate review by this court was limited to the four issues in fn. 1 of this opinion, the brief filed in this court purports to argue nineteen separate issues. The reason for this is that he filed the same briefs in this court which he had filed in the Appeals Court. Notwithstanding the brief, we shall consider only those four issues on which we granted further appellate review. Where there is such a wide difference between the issues argued in the Appeals Court and those on which this court has granted further appellate

by Defendant's wife of her right not to testify against her husband in a criminal proceeding was sufficient to satisfy the requirement of unavailability for the purpose of determining whether the testimony of Defendant's spouse at the probable cause hearing should be admitted under the prior recorded testimony exception to the hearsay rule.

"2. Whether the Appeals Court erred when it affirmed the trial court's decision to refuse to declare a mistrial based on the Commonwealth's calling of the Defendant's wife as a witness, believing it likely that she would claim her marital privilege.

"3. Whether the Appeals Court erred when it held that the Defendant's wife's prior recorded testimony at the District Court probable cause hearing, stenographically recorded by a stenographer employed and paid for by counsel for the Defendant, was admissible, and that General Laws Chapter 221, Section 91B, as in effect at the time of the probable cause hearing and trial in question, was not applicable.

"4. Whether the Appeals Court erred when it upheld the trial court's rulings that the witness, Mrs. Nancy Diemdowicz, answer a question put to her by the Commonwealth regarding what she did with the stenographic notes of the probable cause hearing and that defense counsel turn over said stenographic notes to the Commonwealth in the presence of the jury."

review, the parties should modify or limit their briefs accordingly.

We have examined the four issues presented to us for further appellate review and conclude that there was no error by the judge in his rulings thereon.

The evidence offered by the Commonwealth, in so far as pertinent to the issues before us, is summarized as follows. Harold F. Lowell (Lowell), who was seventy years old, operated a dairy plant or dairy bar in the town of Mendon. The defendant had worked there for about three months in 1970. On the evening of October 25, 1974, Paul Julian drove the defendant to the dairy bar and on the way the defendant told him, "We're going to rob Lowell's." Seeing no lights on in the building when they arrived, they left without trying to enter. At about 9 or 9:30 P.M. on October 26, 1974, the defendant, his then girlfriend, Marianne Belanger, and another man identified only as "Toota" drove to Lowell's dairy bar in Toota's car, arriving there at about 10 P.M. On the way both men said something about "robbing Lowell's." When they arrived at the dairy bar the defendant left the car. Marianne and Toota remained in the car, with the headlights turned off. The defendant returned to the car in about fifteen minutes or a half hour and said that he "just robbed ... hit Mr. Lowell ... [that] he was alive ... [and that] he was okay." They then left the scene, switched to the defendant's car, and did other things not material to the limited issues before us.

About 10:25 that same evening Lowell called the Mendon police dispatcher and said, "I have been held up and robbed. Send the cruiser." The dispatcher broadcast a radio call which brought a police officer to the dairy bar. Lowell's son, Linwood E. Lowell, also heard the broadcast and went to the scene. He and the police officer noticed that a telephone had been pulled from the wall and was lying on the floor, and that the door of the office safe was open. It was concluded from an audit made later that the sum of $1,040.44, representing principally the net receipts from the business of October 25 and 26, 1974, and which should have been in the safe, was missing.

Lowell's son and the police officer also noticed that Lowell was bleeding from injuries to his face. The injuries were later described by a medical witness substantially as follows: a bruise, contusion and abrasion a little over an inch in diameter below the right eye, both eyelids were blue and swollen, an abrasion an inch in length on the lower eyelid, an abrasion on the right temporal area, a laceration a little less than half an inch long on the right of the chin, a laceration and multiple contusions to the mouth and several other small abrasions.

A few minutes after arriving, the police officer left with the cruiser to take Lowell to a hospital, but Lowell apparently died on the way and was pronounced dead on arrival. The Commonwealth's medical expert testified that in his opinion Lowell came to his death as the result of coronary arteriosclerosis with acute heart failure, that the injuries which he observed on the body precipitated Lowell's acute heart failure or heart attack, and that any injury, physical or emotional, can bring about a heart attack and death of a person, especially one who has an established heart condition or heart disease. Lowell had been examined by his doctor on about eight occasions between August, 1973, and October 24, 1974, giving a history which, with the examination and tests, indicated that he had a heart problem or irregularity, but he continued to work and conduct his business as he had always done.

On October 29, 1974, Paul Julian had a conversation with the defendant at Mendon, in the presence of Marianne. Julian asked the defendant for some money and the defendant said he had none. They talked about the fact that Lowell had died, and the defendant said that "it was an accident." Thereafter, Julian, in response to a newspaper item offering a reward of five hundred dollars for information on Lowell's death, went to the police with the information he had, and ultimately he received the reward.

Marianne Belanger was called as a witness by the prosecutor at a hearing held in the District Court on November 25, 1974, on the complaints charging the defendant with robbery and murder of Lowell. She was then the de-

fendant's girlfriend, and was obviously a reluctant and uncooperative witness. With much effort the prosecutor obtained testimony from her to the effect that she was with the defendant and Toota on the evening of October 26, 1974, when they drove to Lowell's dairy bar, that there was conversation between the two men about robbing Lowell, that when they arrived there she and Toota waited in the car while the defendant left the car and that when he returned after a period of time he said something to the effect that he had robbed and hit Lowell, but that Lowell was "okay."

The defendant was represented at the District Court hearing by Mr. George Yagjian, a lawyer of many years of experience in the trial of criminal cases. He was permitted to cross-examine the witness Marianne to the extent that he desired to do so on all matters relating to the crimes charged against the defendant, and did cross-examine her. *Myers* v. *Commonwealth,* 363 Mass. 843 (1973). See *Corey* v. *Commonwealth,* 364 Mass. 137 (1973). The cross-examination, measured in terms of transcript pages, was about half as long as the direct examination of the witness. In the particular circumstances of this case it can reasonably be expected that the defendant's cross-examination of a witness sympathetic to his cause might be less extended than that of a hostile witness.

A stenographer engaged by Mr. Yagjian recorded the testimony of the witness on a stenograph machine and then made two copies of the transcript of the testimony. She turned the transcripts over to Mr. Alfred B. Cenedella, III, another of the defendant's counsel, who paid for them, but who also requested and received the stenographer's original notes.

The prosecutor contended that under an agreement with Mr. Yagjian he was entitled to receive a copy of the transcript on certain terms, but before he was able to do so Mr. Yagjian had withdrawn from the case. Successor counsel disputed the claimed agreement and refused to permit the prosecutor to see or obtain a copy of the transcript. In our view of the case we need not try to resolve

the misunderstanding or disagreement between counsel, since it does not affect the result we reach.

On April 29, 1975, the prosecutor called Marianne Belanger to the stand as his second witness in the Superior Court trial. In answer to the first question she said her name was Marianne DiPietro, and on further questioning she said that she and the defendant were married on April 25, 1975. After answering several more questions of a general nature she was asked about her actions on the evening of the alleged crimes for which the defendant was being tried. She refused to answer, claiming her privilege under the following provision of G. L. c. 233, § 20: "Second, Except as otherwise provided in [G. L. c. 273, § 7, relating to prosecutions for desertion or nonsupport of a wife or children] neither husband nor wife shall be compelled to testify in the trial of an indictment, complaint or other criminal proceeding against the other." Thereupon it was established in the absence of the jury, that she intended to rely on her statutory privilege to refuse to testify against her husband, and she was not questioned further.

The Commonwealth then offered in evidence the transcript of Marianne's testimony at the District Court probable cause hearing, contending that although such evidence was hearsay, it was nevertheless made admissible as an exception to the hearsay rule by a long line of decisions of this court. The defendant did not question the accuracy of the transcript in any respect, but he objected to its production for use as evidence, and to its introduction, at every stage and on almost every conceivable ground. The principal objections were (a) that the admission of such evidence would violate his constitutional right of confrontation, and (b) that under the claimed exception to the hearsay rule such evidence would be admissible only if the witness, in this case Marianne, were unavailable, and that since she was in fact present at the trial she could not be considered unavailable. We shall consider those and other arguments by the defendant in the following numbered paragraphs.

1. *Constitutional right of confrontation.* The defend-

ant contends that the introduction of the transcript violated his right under the Sixth Amendment to the United States Constitution, made obligatory on the States by the Fourteenth Amendment, "to be confronted with the witnesses against him," and his right under art. 12 of the Declaration of Rights of the Massachusetts Constitution, "to meet the witnesses against him face to face." This point has long since been foreclosed against the defendant's contention by numerous decisions of this court and other courts.

In *Commonwealth* v. *Richards,* 18 Pick. 434 (1837), a witness who had testified before a magistrate died before the trial of the same case in the Court of Common Pleas. At the latter trial two witnesses were permitted to testify about what the deceased witness had said before the magistrate. While this court reversed the judgment because the two witnesses were not able to give "the whole of what the deceased witness said upon the matter" (at 439), it rejected the constitutional argument. This court said, at 437: "It has been contended for the defendant, that the admission of such evidence is directly against the 12th article of the bill of rights, which provides, that in criminal cases the subject shall have a right *'to meet the witness against him, face to face.'* Now the defendant did meet the witness who has deceased, face to face, and might have cross-examined him before the magistrate touching this accusation. Was it competent for the witnesses, who testified at the trial in the Court of Common Pleas, in the presence of the prisoner, to state what [the witness], who is now deceased, did swear to before the magistrate in the presence of the prisoner? We do not think that the case falls within the constitutional objection. That provision was made to exclude any evidence by deposition, which could be given orally in the presence of the accused, but was not intended to affect the question as to what was or was not competent evidence to be given face to face according to the settled rules of the common law." The court further mentioned dying declarations, saying, at 437: "Such declarations, made when the accused was not pres-

ent, are admissible in evidence . . . and were not intended to be excluded or touched by the provision cited from the bill of rights."

In *Commonwealth* v. *Slavski,* 245 Mass. 405, 413-418 (1923), we noted that there were many kinds of evidence, including dying declarations and a wide variety of public records, commonly considered hearsay, but which have been made admissible either by legislation or by judicial decisions, without violating the confrontation clauses of the Constitutions. As to public records, Chief Justice Rugg said at 415: "One of the acknowledged exceptions to the face to face rule of evidence is that public records are competent evidence when of probative value respecting an issuable fact. That is an ancient principle of the common law, recognized at the time of the adoption of the Constitution. . . . It cannot be thought that the Constitution was intended to close the door to the legislative department of government to establish new public records with like probative value."

The case of *Commonwealth* v. *Gallo,* 275 Mass. 320, 328-334 (1931), involved the admissibility of the testimony of a witness who testified at the first trial of an indictment and then disappeared before the second trial of the same indictment. Chief Justice Rugg discussed at length the rule permitting the introduction of such evidence, giving the rationale therefor and tracing its history back to English precedents in the early part of the Seventeenth Century. He noted that the admissibility of such evidence predated both the Massachusetts and United States Constitutions, and that it was not changed by the respective confrontation clauses of the two Constitutions. The opinion includes the following statement on this subject, at 333-334: "The constitutional guaranty that every defendant charged with crime has the right to meet the witnesses against him face to face is not to be tested by a mere enumeration of specific instances of the admission or exclusion of defined evidence. That article in the Constitution states a great principle of government for the security of liberty and the ascertainment of truth in prose-

cutions for crime. Its purpose was to put beyond the possibility of alteration except by the people themselves the principle already established as a part of the common law that the witnesses should confront the accused face to face. That principle, although imbedded in the fundamental law as a constitutional guaranty, carried with it the well-recognized exceptions which were a part of it and essential to its vitality. It was not designed to affect the settled rules of the common law for determining the competency of evidence under the principle of confrontation of the accused by the witnesses.... One main purpose of the rules of the common law as to the production of testimony in criminal cases is that its credibility shall be tested by cross-examination. That purpose was achieved in the case at bar. The ground for the admission of testimony given at a previous trial by a witness since deceased or become lunatic is that necessity requires it to the end that justice may be done."

In our most recent discussion on this subject, *Commonwealth* v. *Mustone,* 353 Mass. 490, 492 (1968), we upheld the introduction, at a second trial, of evidence of what a witness had said at the first trial, the witness having died before the second trial. We said that this involved no violation of the defendants' constitutional right of confrontation. See also *Commonwealth* v. *Clark,* 363 Mass. 467, 470 (1973).

The same result has been reached by the United States Supreme Court in construing the confrontation clause of the Sixth Amendment to the United States Constitution. In *Mattox* v. *United States,* 156 U.S. 237 (1895), the Court said at 241: "[T]he authority in favor of the admissibility of such testimony, where the defendant was present either at the examination of the deceased witness before a committing magistrate, or upon a former trial of the same case, is overwhelming. The question was carefully considered in its constitutional aspect by the Supreme Judicial Court of Massachusetts in *Commonwealth* v. *Richards,* 18 Pick. 434 [1837], in which it was said that 'that provision was made to exclude any evidence by de-

position, which could be given orally in the presence of the accused, but was not intended to affect the question as to what was or was not competent evidence to be given face to face according to the settled rules of the common law.' " The Court said further, at 243: "There is doubtless reason for saying that the accused should never lose the benefit of any of these safeguards [provided by the confrontation clause] even by the death of the witness; and that, if notes of his testimony are permitted to be read, he is deprived of the advantage of that personal presence of the witness before the jury which the law has designed for his protection. But general rules of law of this kind, however beneficent in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case. To say that a criminal, after having once been convicted by the testimony of a certain witness, should go scot free simply because death has closed the mouth of that witness, would be carrying his constitutional protection to an unwarrantable extent. The law in its wisdom declares that the rights of the public shall not be wholly sacrificed in order that an incidental benefit may be preserved to the accused." See *Dowdell* v. *United States,* 221 U.S. 325, 329-330 (1911); *Poe* v. *Turner,* 490 F.2d 329, 330-331 (10th Cir. 1974); *Howard* v. *Sigler,* 454 F.2d 115, 117-121 (8th Cir.), cert. denied, 409 U.S. 854 (1972); *United States* v. *Elmore,* 423 F.2d 775, 778 (4th Cir.), cert. denied, 400 U.S. 825 (1970); *United States* v. *Mobley,* 421 F.2d 345, 349-351 (5th Cir. 1970).

While it may appear that varying results have been reached in several of the more recent decisions of the United States Supreme Court involving the admissibility of the prior testimony of a witness, the differences in results were due to differences in underlying facts rather than to any change in the basic interpretation of the confrontation clause. *California* v. *Green,* 399 U.S. 149, 165-168 (1970). *Barber* v. *Page,* 390 U.S. 719 (1968). *Pointer* v. *Texas,* 380 U.S. 400, 402-408 (1965).

We conclude that the admission of the transcript of Marianne's prior testimony did not violate any rights of

the defendant under the confrontation clauses of either the United States or the Massachusetts Constitutions.

2. *Unavailability of witness or her testimony.* One of the conditions precedent to the admissibility of the prior testimony of a witness at a later trial of the same case, or of a case involving the same or substantially the same parties and issues, is that the testimony of that witness cannot be presented by putting the same witness on the stand at the later trial. This situation is sometimes referred to as the unavailability of the witness, but it may be more accurately described as the unavailability of the testimony of the witness, for the witness may be physically present as she was in this case, but her testimony is not available from her at the later trial. Therefore, the question present here is whether the circumstances by reason of which Marianne's testimony is unavailable to the Commonwealth are such as to entitle it to invoke that exception to the hearsay rule which permits the introduction of the transcript of her prior testimony. We hold that they are.

There is no statutory definition of the word "unavailability" in this Commonwealth which can help us in this case. We therefore review those cases in which this particular exception to the hearsay rule has been applied.

A witness has been held unavailable by reason of death in each of the following criminal cases: *Commonwealth* v. *Mustone,* 353 Mass. 490, 491-494 (1968), *Commonwealth* v. *Glassman,* 253 Mass. 65, 73-75 (1925), *Commonwealth* v. *Caruso,* 251 Mass. 362, 366-367 (1925), and *Commonwealth* v. *Richards,* 18 Pick. 434, 437 (1837). It has also been applied in the trial of civil cases. *Costigan* v. *Lunt,* 127 Mass. 354, 356 (1879). *Yale* v. *Comstock,* 112 Mass. 267, 268-269 (1873).

The same rule has also been applied in a criminal case where a witness who testified at the first trial of a case had disappeared and, despite diligent search, could not be located to testify at the second trial. *Commonwealth* v. *Clark,* 363 Mass. 467, 470-471 (1973). *Commonwealth* v.

*Gallo,* 275 Mass. 320, 328-334 (1931). However, mere proof that at the time of the second trial a witness was absent from the Commonwealth has been held insufficient proof of unavailability to permit the introduction of his testimony at the first trial. *Ibanez* v. *Winston,* 222 Mass. 129, 130 (1915), where the absent witness was last heard from in Spain. See *Barber* v. *Page,* 390 U.S. 719, 721-725 (1968). The opposite result was reached in *Mancusi* v. *Stubbs,* 408 U.S. 204, 209-214 (1972), where the absent witness was living in Sweden, and the Court concluded that the State court was thus powerless to compel his attendance at the second trial, and that there was therefore a sufficient predicate of his unavailability to permit the use of prior testimony.

It would appear to be the law of this Commonwealth that, if a witness who has testified at a civil trial thereafter becomes insane, the transcript of her prior testimony is admissible at any retrial of the same case. *Temple* v. *Phelps,* 193 Mass. 297, 304 (1906). See also *Ibanez* v. *Winston, supra.*

This court has twice upheld the exclusion of a transcript of the testimony of a witness at a prior trial when the absence of the witness at a retrial of the same case was due to illness or physical disability. In *Commonwealth* v. *McKenna,* 158 Mass. 207, 210 (1893), we said: "On this question there is a conflict of authority in other jurisdictions, but here, so far as we know, the practice has been to confine such testimony to cases where the witness has died; and the weight of authority elsewhere in criminal proceedings is, we think, that the rule should not be extended to cases where the witness is ill at the time of the trial." In the more recent case of *Vigoda* v. *Barton,* 348 Mass. 478, 486 (1965), we said: "The exclusion of the prior testimony was proper. Without considering the plaintiff's contention that we should now overrule *Commonwealth* v. *McKenna,* 158 Mass. 207 [1893], or expressly limit it to criminal proceedings, we sustain the ruling of the trial judge on the ground that the plaintiff failed to

show that the witness was so ill as to be unable to travel."
It is not necessary, for the purposes of the present case,
that we intimate any opinion whether the prior testimony
of a witness who has been found by the judge to be unable
to travel or to attend a subsequent trial is admissible at
the later trial.

We have found no case, and none has been brought to
our attention by the parties, in which this court has con-
sidered the admissibility of the prior testimony of a wit-
ness who, when called to testify at a later trial of the
same or substantially the same case, exercises a privilege
which entitles him to refuse to testify. Does the exercise of
the privilege render the testimony expected from that
witness unavailable within the meaning of that word as
used in the exception to hearsay rule with which we are
here concerned? In such circumstances, is evidence of the
prior testimony of that witness admissible at the later
trial, assuming that other conditions of admissibility, such
as the opportunity for cross-examination at the earlier
trial or hearing, are met? We believe that the correct an-
swer to both questions is in the affirmative.

We repeat at this point that we are concerned here with
the availability of the testimony of the witness at a later
trial, not merely the physical presence of the witness. In
*Mason* v. *United States,* 408 F.2d 903, 906 (10th Cir.
1969), cert. denied, 400 U.S. 993 (1971), the court said in
a similar situation that "the important element is whether
the *testimony* of the witness is sought and is available and
not whether the witness's body is available." The physical
presence without the testimony contributes nothing to the
later trial. From the viewpoint of the administration of
justice, we see no difference between the unavailability of
the expected testimony because of the death of a wit-
ness and its unavailability because the witness, although
present, exercises a privilege not to testify.

We are supported in our belief by the analogy made by
this court in *Commonwealth* v. *Gallo,* 275 Mass. 320,
334 (1931), when we were first faced with the question
whether the disappearance of a witness sufficed as the

basis for holding that his testimony was unavailable, and that, therefore, his prior testimony in the same case could be introduced at the later trial. We said, at 334: "The ground for the admission of testimony given at a previous trial by a witness since deceased or become lunatic is that necessity requires it to the end that justice may be done. The necessity is just as urgent if the witness cannot be found or is without the jurisdiction. Under modern conditions, absence from the reach of legal process is easy as compared with earlier days. Changed conditions afford no warrant for straining the Constitution. But they require that the common law within the limits of the Constitution shall adapt its principles to meet present needs. We are unable to perceive any sound distinction in reason for holding that the principle declared in *Commonwealth* v. *Richards*, 18 Pick. 434 [1837], in favor of the admission of testimony previously given by a witness since deceased, in *Temple* v. *Phelps*, 193 Mass. 297 [1906], in favor of the admission of testimony previously given by a witness since become insane, and in *Commonwealth* v. *Slavski*, 245 Mass. 405 [1923], as to the admission in evidence of a new kind of public document and the numerous cognate cases there reviewed, is not equally applicable to the case at bar."

Our conclusion that the judge properly ruled that Marianne's exercise of her privilege not to testify against her husband, the defendant, made her testimony unavailable is in accord with the prevailing view in many other jurisdictions and the views expressed by recognized legal scholars on the subject. Cf. *State* v. *Jaques*,      S.D. (1977).[a]

Both the Uniform Rules of Evidence (1974) and the Federal Rules of Evidence, the latter of which became effective on July 1, 1975, by Pub. Law 93-595, included a Rule 804 (a) and (b), and both include substantially similar language in the rule relating to the admissibility of the prior testimony of a witness who has become unavailable

[a] 256 N.W.2d 559 (1977).

Commonwealth *v.* DiPietro.

to testify at a later trial. The pertinent portions of both
versions of the rule are reproduced in the margin.[2] In their
definitional provisions each rule defines as unavailable as a
witness, a declarant who "(1) is exempted by ruling of
the court on the ground of privilege from testifying con-
cerning the subject matter of his statement." Each version
of the rule then provides, in par. (b) thereof, that the
prior testimony given by a witness at another hearing of
the same or a different proceeding shall not be excluded
by the hearsay rule if the declarant is unavailable, and if,

---

[2] *Uniform Rules of Evidence,* Rule 804: "(a) *Definition of unavail-
ability,* 'Unavailability as a witness' includes situations in which the
declarant:

"(1) is exempted by ruling of the court on the ground of privilege
from testifying concerning the subject matter of his statement; or

"(2) persists in refusing to testify concerning the subject matter of
his statement despite an order of the court to do so; or

"(3) testifies to a lack of memory of the subject matter of his state-
ment; or

"(4) is unable to be present or to testify at the hearing because of
death or then existing physical or mental illness or infirmity; or

"(5) is absent from the hearing and the proponent of his statement
has been unable to procure his attendance (or in the case of a hearsay
exception under subdivision (b)(2), (3), or (4), his attendance or testi-
mony) by process or other reasonable means.

"A declarant is not unavailable as a witness if his exemption, refusal,
claim of lack of memory, inability, or absence is due to the procurement
or wrongdoing of the proponent of his statement for the purpose of
preventing the witness from attending or testifying.

"(b) Hearsay exceptions. The following are not excluded by the
hearsay rule if the declarant is unavailable as a witness:

"(1) Former testimony. Testimony given as a witness at another
hearing of the same or a different proceeding, or in a deposition taken
in compliance with law in the course of another proceeding, at the in-
stance of or against a party with opportunity to develop the testimony
by direct, cross or redirect examination with motive and interest similar
to those of the party against whom now offered."

*Federal Rules of Evidence,* Rule 804: Federal Rule 804(a) differs
from Uniform Rule 804(a) in such minor respects that they do not
warrant quoting the former. The last part of the Federal Rule 804(b)(1)
differs somewhat from its Uniform Rule counterpart and it is therefore
quoted: Federal Rule 804(b)(1): "(1) Former testimony. — Testimony
given as a witness at another hearing of the same or a different pro-
ceeding, or in a deposition taken in compliance with law in the course
of the same or another proceeding, if the party against whom the
testimony is now offered, or, in a civil action or proceeding, a predeces-
sor in interest, had an opportunity and similar motive to develop the
testimony by direct, cross, or redirect examination."

when the testimony was first given, the party against whom it is now offered in a later proceeding had an opportunity to develop the testimony by direct, cross, or redirect examination.

A growing number of States have adopted provisions substantially similar to the Uniform Rules of Evidence or the Federal Rules of Evidence, including the provisions of Rule 804 (a) (1) and (b) (1) relating to the admissibility of the prior testimony of a witness who later refuses to testify under a claim of privilege. For a further discussion of this subject, and for citations to cases from various jurisdictions thereon, see McCormick, Evidence § 253 (2d ed. 1972); 3 C. Torcia, Wharton's Criminal Evidence § 651 (13th ed. 1973); 2 S. Gard, Jones on Evidence, Civil and Criminal §§ 9:22-9:23 (6th ed. 1972); 4 J. Weinstein & M. Berger, Evidence par. 804, at 804-16 to 804-21, and 804-29 to 804-30, par. 804 (a), at 804-36 to 804-37 (1976); 5 J. Wigmore, Evidence §§ 1397, 1398, 1401, 1402, 1409 (Chadbourn rev. 1974); and Annot., 45 A.L.R.2d 1354 (1956).

Even before the effective date of the Federal Rules of Evidence, it was uniformly held by a number of the Federal Courts of Appeal that if a witness who has once testified in the trial of a case is called again to testify at a later trial of that case, and he exercises his privilege against testifying, that is sufficient to establish the unavailability of his testimony for the purpose of introducing his prior testimony. In *United States* v. *Mobley,* 421 F.2d 345, 350-351 (5th Cir. 1970), it was held that a witness's "silence in reliance, albeit misplaced, upon Fifth Amendment rights, makes him no less unavailable than death or absence from the country or physical inability to speak." *Park* v. *Huff,* 506 F.2d 849, 860 (5th Cir.), cert. denied, 423 U.S. 824 (1975). *United States* v. *Collins,* 478 F.2d 837, 838 (5th Cir.), cert. denied, 414 U.S. 1010 (1973). *United States* v. *Wilcox,* 450 F.2d 1131, 1142-1143 (5th Cir. 1971), cert. denied, 405 U.S. 917 (1972). *Williams* v. *Nelson,* 435 F.2d 1293 (9th Cir.), cert. denied, 403 U.S. 933 (1971). *Mason* v. *United States,* 408 F.2d 903, 905-906

(10th Cir. 1969), cert. denied, 400 U.S. 993 (1971). See *United States* v. *Elmore*, 423 F.2d 775, 778 (4th Cir.), cert. denied, 400 U.S. 825 (1970).

3. *Denial of motion for mistrial.* Before the prosecutor called the defendant's wife, Marianne, to the stand he had been informed by counsel for the defendant that she had married the defendant and that if called to the stand she would exercise her statutory privilege under G. L. c. 233, § 20, Second, not to testify against her husband. The prosecutor nevertheless called her to the stand and when she was asked the first question about the events on the day of the alleged crimes, the defendant asked for a bench conference and then for a voir dire to determine her willingness to testify.[3]

The jurors were excused and a voir dire was held during which the witness, in answer to questions by the prosecutor, said that she did not want to testify against her husband. The jurors were brought back to the court room and, in answer to questions put by the judge, the witness told them the same thing. The judge then ruled that the witness did not have to testify against her husband, and no further attempt was made to question her. The judge said to the jury: "I will instruct the jury, too, that in any proceeding a spouse, a husband or wife, cannot be compelled to testify either one against the other." The defendant made no objections and took no exceptions to any part of this entire procedure, nor did he request that the judge give the jury any different or further instructions. The

---

[3] At one point in the voir dire the defendant contended that to compel the witness to testify about the alleged crimes would violate G. L. c. 233, § 20, First, providing that, with certain exceptions not here material, "neither husband nor wife shall testify as to private conversations with the other." The defendant contended that somehow the marriage of April 25, 1975, made inadmissible the conversations between Marianne and the defendant in October, 1974. "Private conversations in this sense can occur only during the existence of marriage. Neither the reason nor the letter of that rule [excluding private conversations] applies to conversations held before marriage. Such conversations are not excluded from being offered as evidence in court." *Commonwealth* v. *Barronian,* 235 Mass. 364, 366 (1920).

trial then continued the rest of that day with the presentation of testimony to the jury by two other witnesses.

The next morning the defendant presented a motion for mistrial on the ground of the action of the prosecutor on the previous day in putting Marianne on the stand after he had been informed by the defendant that she would exercise her privilege not to testify against the defendant. He contended that he was prejudiced thereby because "the jury might speculate that the wife's refusal to testify was based on the fact that her testimony would be of an incriminating nature."

The judge, after a hearing, denied the motion, and the defendant's exception to that denial is the basis of the assignment of alleged error on which he now seeks further appellate review.

It is the general rule in the trial of both civil and criminal cases that when something occurs which constitutes the basis for requesting a mistrial it must be called to the attention of the judge immediately, or when the aggrieved party first learns of it, in order that the judge may take whatever action may be required in the circumstances. If this is not done seasonably, the incident may not be availed of later as the basis for a claim of appellate review. *Commonwealth* v. *Homer,* 235 Mass. 526, 536 (1920). *Commonwealth* v. *Richmond,* 207 Mass. 240, 250 (1911).

The defendant in this case, having made no objection and filed no motion for mistrial on the occurrence of the incident of which he now complains, and having thus lost his right of appellate review thereon, cannot, by resort to the stratagem of a belated motion for mistrial and an appeal from the denial thereof, be restored to the position in which he would have been if he had seasonably moved for mistrial.

The situation is analogous to that in which a party who failed to lay the groundwork for appellate review during the trial of a case resorts to filing a motion for a new trial by which he asks the judge, in effect, to relieve him from his predicament resulting from his failure to save exceptions which he could have saved, but did not save, at the

trial. We have held many times that the party cannot use a motion for a new trial as the belated vehicle for raising or revising appellate rights previously lost by failing to claim or perfect them seasonably. *Commonwealth* v. *Antobenedetto,* 366 Mass. 51, 58 (1974). *Commonwealth* v. *McLaughlin,* 364 Mass. 211, 229-231 (1973). *Commonwealth* v. *Richardson,* 361 Mass. 661, 663, cert. denied, 409 U.S. 884 (1972). *Commonwealth* v. *Underwood,* 358 Mass. 506, 510-511 (1970). In *Commonwealth* v. *Stout,* 356 Mass. 237, 243 (1969), we said: "Order in the administration of criminal justice requires that if a defendant is aggrieved by what transpires during his trial he should follow the pattern prescribed for insuring that his grievances reach the reviewing court through the processes which amply provide that insurance. We cannot retry every criminal appeal on the basis of what might have been."

We conclude that the defendant's motion for mistrial was not seasonably filed and that it brings nothing to us for appellate review. However, even if we were to treat the motion as though it had been filed seasonably, we would conclude that it was proper for the judge to deny it for the reasons discussed below.

General Laws c. 233, § 20, Second, protects one spouse from being compelled to testify against the other and, except as to private conversations between them, "[t]here is nothing which prevents a husband or wife from testifying against the other in criminal proceedings if the one testifying is willing to do so. The competency of the one testifying in such a case does not depend on the consent of the other." *Commonwealth* v. *Barker,* 185 Mass. 324, 325 (1904). "As to private conversations with each other, neither husband nor wife is allowed to testify, no matter how much the testimony is desired by either of them or by any third party. As to their testimony against each other either may testify, but shall not be compelled so to do in a criminal proceeding against the other. The privilege is that of the spouse called and not of the defendant." *Commonwealth* v. *Spencer,* 212 Mass. 438, 451 (1912). Therefore the privilege to refuse to testify in this case was per-

sonal to Marianne, to be exercised by her and not the defendant.

In speaking of the constitutional privilege against self-incrimination, we said in *Ross* v. *Crane,* 291 Mass. 28, 32-33 (1935): "The constitutional guaranty which he invokes is a protection against being compelled to testify. It is a personal privilege. It confers an option to refuse to testify. It does not prohibit inquiry. It does not prevent the voluntary giving of testimony." In *Commonwealth* v. *Granito,* 326 Mass. 494, 498-499 (1950), we said, "Until the witness claimed the privilege [against self-incrimination] it could not be known that they [the questions] would not be answered. The possibility that the witness may claim the privilege does not prohibit the asking of the question." In *Commonwealth* v. *Martino,* 361 Mass. 720, 721 (1972), we said: "The judge was not required to accept counsel's representations that [two named witnesses] would refuse to testify. Nor was he required to conduct the voir dire examinations. The only information he could elicit from the witnesses during voir dire would be that, depending on the question, they might possibly refuse to answer. He 'could not pass on a claim of self-incrimination until a specific question was propounded and the privilege was invoked.' *United States* v. *Terry,* 362 F.2d 914, 917 (6th Cir.) [1966]."

The statements quoted above from our decisions in the *Ross, Granito,* and *Martino* cases apply equally to the present case where the witness asserted the statutory privilege not to testify against her husband. The judge was not required to accept the defendant's statement that she would exercise the privilege, the prosecutor was not precluded from calling her to the stand in the presence of the jury to inquire of her to the point where she claimed the privilege, after which the judge proceeded by voir dire, and the procedure followed violated no rights of the defendant. Indeed, in this case there was an additional reason for proceeding before the jury to the point where Marianne indicated she would claim the privilege. The prosecutor was attempting to establish the foundation

which would permit him to offer the transcript of the testimony she had previously given in the District Court. The keystone of that foundation was the present unavailability of her testimony and the resulting necessity for use of the transcript. He had the right to show the jury the basis of the unavailability. He was not compelled to leave the jury speculating why he was introducing the transcript of Marianne's prior testimony when she was in fact present in court.

The defendant's contention "that the Commonwealth's tactic in calling the defendant's wife to be sworn was reversible error" cannot be considered in isolation from the fact that the necessity for proving the unavailability of her testimony arose because of the defendant's own act, perhaps a matter of strategy, in marrying the principal potential witness against him. While the marriage to Marianne and her refusal to testify shielded the defendant from whatever testimony she might otherwise have been compelled to give in person to the jury, it did not preclude the prosecutor's resort to any other lawful means of proving the Commonwealth's case. One such means was by the introduction in evidence of the transcript of Marianne's prior testimony. To do this, the Commonwealth was first required to prove the unavailability of her testimony in person before the jury. One way to prove that was by putting her on the stand, as was done, through the point where she claimed her privilege not to testify. He might have done it differently, such as by seeking a stipulation on the pertinent facts, but in the end the option of how to prove the unavailability belonged to the prosecutor, not to the defendant.

The defendant in effect claims foul because of the way the prosecutor elected to proceed. The average court trial by competent counsel often reflects strategic plans previously conceived on both sides of the case being executed by a series of tactical moves aimed at reaching a desired result. The tactics are subject to change as circumstances may require to accommodate unexpected or unanticipated developments. The defendant's marriage of a witness

against him just four days prior to trial was such a development, and the prosecutor changed his tactics to meet the occasion. There are certain risks inherent in most strategic decisions and tactical moves, and the strategist or tactician on neither side is in a very good position to claim foul if his own strategy backfires or he is outmaneuvered. It is not a function of this court to protect a litigant from the inherent consequences of a risk which he voluntarily assumes.

4. *Admissibility of transcript of prior testimony as affected by G. L. c. 221, § 91B, and G. L. c. 233, § 80.* The transcript of Marianne's testimony in the District Court on November 25, 1974, was prepared by a stenographer provided by the defendant at his own expense, as then permitted by G. L. c. 221, § 91B, inserted by St. 1965, c. 585, which provided in part that "the transcripts of notes taken by stenographers provided under the authority of this section shall not be admissible under the provisions of [G. L. c. 233, § 80]." As of the same date, G. L. c. 233, § 80, provided in part that "[t]ranscripts from stenographic notes duly taken under authority of law in the supreme judicial, superior or probate court by a stenographer duly appointed for the purpose and sworn, when verified by the certificate of such stenographer, shall be admissible as evidence of testimony given whenever proof of such testimony is otherwise competent."[4]

The defendant argues that by virtue of the language of these statutes the transcript of Marianne's testimony in the District Court did not qualify for admissibility in evidence under G. L. c. 233, § 80. We agree for the obvious rea-

---

[4] Both statutes have since been amended by St. 1975, c. 457, §§ 1 and 2, approved July 11, 1975, to read in pertinent part as follows: G. L. c. 221, § 91B: "The transcripts of notes taken by stenographers provided under authority of this section shall be admissible in accordance with the provisions of [G. L. c. 233, § 80]." G. L. c. 233, § 80: "Transcripts from stenographic notes duly taken under authority of law in any court proceeding by a stenographer duly appointed for the purpose and sworn, when verified by the certificate of such stenographer, shall be admissible as evidence of testimony given whenever proof of such testimony is otherwise competent."

son that at the time of the defendant's trial in the Superior Court in April, 1975, G. L. c. 233, § 80, by its very terms, applied only to "[t]ranscripts from stenographic notes duly taken under authority of law in the supreme judicial, superior or probate court."

The defendant next argues that because the transcript did not qualify under G. L. c. 233, § 80, it was error to admit it in the trial of these indictments. For the reasons stated below, we do not agree with that contention.

There is no requirement of the law of this Commonwealth that the prior testimony of a witness who, since testifying, has become unavailable to testify at a later trial, may be proved only by means of an official transcript of the earlier testimony complying in every respect with the strictures of G. L. c. 233, § 80. It is true that in several cases decided by this court the prior testimony of the unavailable witness was proved by means of such a transcript. *Commonwealth* v. *Clark*, 363 Mass. 467, 470 (1973). *Commonwealth* v. *Gallo*, 275 Mass. 320, 328 (1931). However, it is also true that in some other cases the proof in the Superior Court of the prior testimony was by means of unofficial transcripts of probable cause hearings in the District Court. *Commonwealth* v. *Mustone*, 353 Mass. 490, 492 (1968). *Commonwealth* v. *Caruso*, 251 Mass. 362, 366-367 (1925).

In the *Mustone* decision we said, in fn. 1 at 493: "We do not view G. L. c. 221, § 91B, inserted by St. 1965, c. 585, as making such transcripts [unofficial transcripts of District Court proceedings] inadmissible if, under common law principles, they could be admitted apart from G. L. (Ter. Ed.) c. 233, § 80, as an exception to the hearsay rule or otherwise." Then, speaking more broadly than strictly necessary for the decision of that case, but nevertheless speaking correctly, we added, at 494: "The stenographer and any other person then present may testify about what was said at the earlier hearing, if the trial judge determines that, through the witness, 'the former . . . testimony can be substantially reproduced in all material particulars,' and that the witness is now unavailable. *Common-*

*wealth* v. *Glassman,* 253 Mass. 65, 74-75 [1925].... Any
competent witness may refresh his memory from his notes
or other documents or he may produce a reliable record of
his past recollection." That statement was in accord with
many of our earlier decisions on the subject.

In *Commonwealth* v. *Glassman,* 253 Mass. 65, 74-75
(1925), the proof in the Superior Court of what a witness,
since deceased, had testified to at the earlier trial of the
same case in a Municipal Court was through the testimony
of a person who had been present at the earlier trial and
who was able substantially to reproduce the material tes-
timony of the now deceased witness. The same type of
proof of the earlier testimony was approved in *Common-
wealth* v. *Shooshanian,* 210 Mass. 123, 126-127 (1911);
*Costigan* v. *Lunt,* 127 Mass. 354, 356-357 (1879), where
the proof was through the testimony of a lawyer who had
been present at the earlier trial, and *Commonwealth* v.
*Richards,* 18 Pick. 434, 437-440 (1837), where, although
this type of proof of the earlier testimony was proffered, it
was rejected for the reason that the witness was unable to
reproduce the earlier testimony substantially in all mate-
rial particulars. In *Jaquith* v. *Morrill,* 204 Mass. 181, 189
(1910), the proof of the earlier testimony was by the audi-
tor before whom that testimony had been given. In *Yale*
v. *Comstock,* 112 Mass. 267, 269 (1873), the proof was by
a master in chancery who had heard the earlier testimony
and made a report thereof to the court.

The ruling of the judge permitting the use of the tran-
script of the District Court probable cause hearing to
prove the prior testimony of Marianne, who had become
unavailable to the prosecution because of her marriage to
the defendant, is fully supported by the decisions of this
court in the *Mustone* and *Caruso* cases in particular, and
by the rationale of the other cases cited above. It is also
in accord with the views expressed in widely used and fre-
quently cited works on this subject, accompanied by cita-
tions of precedents from other jurisdictions. McCormick,
Evidence §§ 260-261 (2d ed. 1972). 3 C. Torcia, Wharton's
Criminal Evidence § 652 (13th ed. 1973). 2 S. Gard, Jones

on Evidence, Civil and Criminal § 9:29 (6th ed. 1972). Annot., 11 A.L.R.2d 30 (1950). For similar works dealing with this subject, but limited to the law of this Commonwealth, see W.B. Leach & P.J. Liacos, Massachusetts Evidence 192-193 (4th ed. 1967), K.B. Hughes, Evidence § 467 (1971), and G. Mottla, Proof of Cases in Massachusetts § 244 (2d ed. 1966).

The defendant argues that our decision in the *Mustone* case is not applicable to the present case for two reasons. The first reason is that the *Mustone* holding applies only when the unavailability of the witness is due to death. We have already rejected that argument in part 2 above. The second reason is that in the *Mustone* case there is some mention of the use of the transcript of the prior testimony to refresh the stenographer's memory, whereas in the present case the transcript was ultimately allowed to be used on the basis of past recollection recorded. If indeed there is such a distinction, it is without difference in result, assuming as we do in this case that the transcript was a complete and accurate reproduction of the prior testimony of the witness. We see no need to discuss this point further.

5. *Proceedings in the presence of the jury in relation to the District Court transcript.* The defendant requested further appellate review of certain rulings by the judge during proceedings before the jury in relation to the District Court transcript. He claims error and resulting prejudice to him from two occurrences which we shall consider separately.

(a) The judge permitted the prosecutor to ask the stenographer what she did with the stenographic notes which she had made at the District Court probable cause hearing, and she answered that she had mailed them to Mr. Cenedella, one of the defendant's counsel. The defendant's total argument on this point as it appears in his brief is that "by allowing the witness to answer that she had mailed them to defense counsel, in the jury's presence, the court unnecessarily permitted the substantial likelihood that such response created such an unfavorable inference in the jury's mind respecting the possibility of

Commonwealth *v.* DiPietro.

defense counsel's tampering with the evidence, that the defendant was irretrievably prejudiced and hence denied a fair trial."

This argument is totally without foundation in the record, and without merit. At no time did the prosecutor or any other person suggest that the notes had been, or might have been, tampered with. The stenographer readily identified her own notes when the judge ordered the defendant to produce them. The only express ground for objection stated by the defendant at the time was that the notes were "a work product." As to that ground the objection was properly overruled on the authority of our holding and discussion of a similar point in *Commonwealth* v. *Mustone,* 353 Mass. 490, 494 (1968).

(b) After the stenographer testified that she had turned her notes over to Mr. Cenedella, the prosecutor demanded that the defendant produce them and he did so over objection and exception. The defendant now complains that it was error for the judge to order the notes produced in the presence of the jury. We disagree for the reason, quite apparent from the transcript, that the judge gave the defendant ample opportunity to produce the notes without being ordered to do so and the defendant declined to do so.[5]

---

[5] Before the judge allowed the stenographer to testify that she had mailed her stenographic notes to Mr. Cenedella, the following colloquy took place at the bench conference:

THE JUDGE: "What is your objection, Mr. Fisher?"

COUNSEL FOR THE DEFENDANT: "Well, again, Your Honor, I have several objections. Number one — — "

THE JUDGE: "I have ruled in anticipation, really, but if it's a work product, I am not inclined to so regard it."

COUNSEL FOR THE DEFENDANT: "This is one of the objections that this is a work product."

THE JUDGE: "I heard the lawyer who took this say he could have a copy at his own expense. Now, somebody has got those notes, and we've gone as far as we can. Now, you can turn them over now if you want. And, if it's a matter of strategy, I don't care, but we're going to pursue this now with this witness. You asked for an indication and I gave you one. You heard that lawyer testify."

COUNSEL FOR THE DEFENDANT: "Yes, I did, Your Honor."

THE JUDGE: "In any event, the agreement was if he wanted a copy, he could have one furnished at his own expense."

COUNSEL FOR THE DEFENDANT: "Yes."

THE JUDGE: "So, you can do whatever you want, but I am allowing

The defendant objected at every turn to the attempt and effort by the prosecutor to introduce the prior testimony of Marianne Belanger. He put the Commonwealth to the proof of every fact necessary for the discovery of the transcript and for laying the foundation of admissibility. The defendant had the right to do that since the Commonwealth at all times had the burden of proof in the matter. Once again, it was the defendant's strategy or tactics which resulted in the prosecutor's taking the route of a formal demand in open court for the defendant's production of the stenographic notes. If the defendant was in any way hurt thereby, the wound was self-inflicted. It cannot now be attributed to any alleged error by the judge. There was no such error.

6. Having considered all of the issues on which the defendant requested and was granted further appellate review by this court, we find that there was no error. We order that the judgments be affirmed as to both indictments.

*So ordered.*

---

the inquiry. If you want to avoid that, you can do that. That's a matter for you to determine."

COUNSEL FOR THE DEFENDANT: "Right. I understand. But I would like to be clear on the position."

THE JUDGE: "I can't be anymore clearer than I am. I am not going to go any further than that. If you want to put your next inquiry, 'What did you do with them?', I will rule on it. Let's go."

COUNSEL FOR THE DEFENDANT: "Exception."