COMMONWEALTH *vs.* ALAN L. LUSSIER.

Suffolk.    November 5, 1973. — December 18, 1973.

Present: TAURO, C.J., REARDON, QUIRICO, KAPLAN, & WILKINS, JJ.

*Homicide. Jury and Jurors. Constitutional Law,* Due process of law, Equal protection of laws. *Practice, Criminal,* Fair trial, Argument by prosecutor, Election.

At the trial of an indictment for murder of a girl by beating her, the evidence, together with reasonable inferences to be drawn therefrom, was sufficient to support the jury's conclusion that the defendant was guilty beyond a reasonable doubt. [420-422]

At the trial of an indictment for murder, the rights of the twenty-four year old defendant under the due process and equal protection clauses of the Fourteenth Amendment of the Federal Constitution were not violated by G. L. c. 234, § 1, in that it exempted from jury duty persons under twenty-two years of age. [423-424]

At the trial of an indictment for murder, although certain remarks made by the prosecutor in his closing argument were not approved by this court, when viewed in the overall context they were not so prejudicial as to justify reversal. [424-425]

At the trial of an indictment for murder, after the decision in *Furman* v. *Georgia,* 408 U.S. 238 (1972), the judge did not commit error by allowing inquiries, and eventual dismissal, of jurors who were opposed to the death penalty where the Commonwealth was not restricted to a rape-murder theory; this court was unable to conclude that the exclusion of jurors opposed to capital punishment resulted in an unrepresentative jury on the issue of guilt or substantially increased the risk of conviction. [425]

INDICTMENT found and returned in the Superior Court on January 12, 1972.

The case was tried before *Paquet,* J.

*Lawrence D. Shubow* for the defendant.

*Thomas J. Mundy, Jr.,* Assistant District Attorney, for the Commonwealth.

TAURO, C.J. This is an appeal pursuant to G. L. c. 278, §§ 33A-33G, from a conviction of murder in the first degree committed with extreme atrocity or cruelty. The defendant, aged twenty-four at the time of his arrest, argues that (1)

young persons were unconstitutionally excluded from the jury in violation of the Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution, (2) the verdict was based on insufficient evidence, (3) the prosecutor's summation argument was improper and prejudicial, (4) the trial court erred in failing to require the Commonwealth to elect among its theories of murder and in allowing the exclusion of jurors with strong views against capital punishment. We cannot agree.

The evidence, which was solely circumstantial as it related to the defendant's guilt or innocence, may be briefly summarized as follows. The victim, a nineteen year old third year student at Northeastern University's School of Nursing, on the evening of October 30, 1971, with her roommate and some friends went to a Halloween party on the third floor, apartment 32, at 72-74 Westland Avenue, Boston. The next night, around 7:30 P.M., she was found dead, badly beaten and bloodied, in a vacant apartment, number 22, on the second floor in the same building. From six to eight weeks prior to the party the defendant Alan Lussier had occupied apartment 14 along with three other men. The four performed janitorial services in lieu of rental payments, and on the day of October 29, Lussier, along with two of his roommates, had spent time cleaning and preparing apartment 22 for prospective tenants.

Lussier had been observed at the Halloween party by a number of witnesses. He had not been invited, and was one of the few persons out of between twenty-five and one hundred in attendance who had not worn a costume. Witnesses recalled his wearing brown leather square-toed boots, blue and white striped dungarees, and a black leather motorcycle jacket. These articles of clothing, along with a purple and white pin-striped shirt and a cat-faced ring, were all later identified as belonging to Lussier. Bloodstains were discovered on these items in the course of the police investigation, but only in the case of the right boot was there sufficient quantity of blood to allow for blood group identification. The F. B. I. identified the blood as "O positive." Two per-

sons at the party were determined to be within this blood group — the victim, and one William Devereaux, who had been involved in an altercation during the course of the party, and with whom the defendant, according to the testimony, had been in near or actual contact during and after the altercation.

The Devereaux incident occurred about 12:30 or 12:45 A.M. Witnesses recalled that a group of persons had assaulted Devereaux in the vicinity of the kitchen and hallway in apartment 32, and that he had been bleeding afterwards. Devereaux was later taken to a hospital for stitches and minor oral surgery. One witness described the bleeding as "continuous" but not "massive." Another remembered that there were a couple of splotches of blood on the wall and on the casing of the kitchen entrance. A defence witness testified to the existence of a pool of blood in the hallway after the fight, but other witnesses either had no such recollection or described the "pool of blood" as the sticky residue of spilled beer.

Devereaux, who himself characterized his bleeding as "flowing every time I opened my mouth," was "almost positive," but "not absolutely 100% positive," that Lussier had come between him and his assailant and had broken up the fight. He testified to spitting out blood as a result of his injuries but could not recall whether he had spit or dripped any blood directly onto Lussier. Other witnesses were also unable to say whether Devereaux's blood had at some point come onto Lussier's person or clothing.

Immediately after the fight, Devereaux had been ushered out into the main hallway on the third floor of the apartment building. Witnesses testified that Lussier then appeared at the scene, described himself as superintendent of the building, and ordered Devereaux off the premises. Devereaux was still bleeding at that point and, according to one witness, was close to, but not in actual contact with, Lussier. ("The kid [Devereaux] was leaning against the wall. Alan Lussier was standing on this side of him — with his hand up against the wall — like that — a foot and a half away from.")

Devereaux soon left for the hospital.

After these events, about 1:15 A.M., Lussier, the victim, one James Yurkus and a Wayne Fricke were engaged in a conversation in the kitchen of apartment 32. Yurkus had met the victim previously, and Fricke had known her for at least two years as a student at Northeastern. Both testified that the group had remained in the kitchen for fifteen or twenty minutes. Yurkus recalled that the victim at some point during the conversation remarked to Lussier that all the superintendents she knew were "freaky," but when he asked her if he appeared that way, she answered, "No." About 1:30 A.M., the group moved into the living room where Fricke cleared an area for himself and the victim to sit. He testified that about fifteen minutes later, Lussier said to the victim, "I'd like to talk to you for a few minutes." Lussier then took her hand and they went out into the hallway of apartment 32, where the victim sat down in a chair. Fricke, who had intended to walk the victim home after the party observed the two talking in the hallway for the next fifteen minutes, until approximately 2 A.M., at which point they stood up, joined hands, and left the apartment through the back door. The victim was never seen alive again.

Kathleen Bahm lived in apartment 12, directly below apartment 22 where the victim's body was later found. She testified that around two fifteen she heard people, more than one, running in the apartment upstairs, and that five minutes later she heard a "loud thud as though someone fell." Her roommate, Sherry Klein, gave the same testimony.

According to Bryan McMahon, one of the defendant's roommates, Lussier came back to apartment 14 about two thirty, picked up some clothes, and departed for the apartment of his girl friend. Her testimony was that Lussier had come by that night, but she did not remember the time, and that he was there when she awoke the next morning. Witnesses testified to seeing Lussier return to his apartment building around 4 A.M.

That morning about eleven, Lussier knocked on the door of apartment 32 and spoke with a Charles Bell. Bell, who

knew Lussier only as someone who worked around the building, testified that Lussier said something to the effect that he, Lussier, had had quite a bit to drink at the party the night before, and inquired if there had been any trouble during the course of the evening.

By 7 P.M. the victim's roommate had not heard from her and was concerned about her whereabouts. She called Andrew Hildreth, another resident of apartment 32, who in turn went down to apartment 14 to ask Lussier whether he had seen the victim. Lussier said he had not seen her, nor had he left the party with her.

Shortly thereafter, about 7:30 P.M., the severely battered and bloody body of the victim was discovered in apartment 22 by Sherry Klein and her roommates.

Miss Klein testified that the victim's body was in the approximate location where she had heard the "thud" in the early morning. The group then contacted Lussier and his roommates in apartment 14 and told them what they had discovered. At the request of one of the members of the group, Lussier telephoned the police. His demeanor, according to Miss Klein, was calm.

The police arrived at eight thirty and began examining the scene. With the exception of the victim's hat, headband, and shoes, none of her clothing was found. A bloody footwear impression was discovered in the carpet near the body. A piece of bloodstained toilet tissue was found behind the toilet in the bathroom, and scrape marks were detected on the edge of a nearby sink. Along with Lussier's clothing, described earlier, and a blood-free chair leg, these items constituted the whole of the Commonwealth's physical evidence connecting Lussier with the crime.

Lussier was arrested on the same night, soon after the police discovered his bloodstained boots in apartment 14. At police headquarters, Lussier made a statement in which he admitted speaking to the victim in the kitchen at the party in apartment 32, but he denied sitting and speaking with her at any other time, and maintained that they had not left the party together.

At the trial, three expert witnesses testified as to the results of their examination of the victim's body, the defendant's clothing, and other objects found at the scene of the crime. Dr. George Curtis, Suffolk County medical examiner, who arrived at the murder scene at 10:30 P.M., testified to what he observed during his examination of the victim's body, and used photographic exhibits and slides to explain his observations. He placed the time of death somewhere between twelve midnight and seven in the morning of October 31, 1971. In his opinion, the cause of death was "multiple blows to the head." These injuries, he said, were consistent with the victim being kicked in the nose, eyes, forehead and probably the neck by a person wearing a boot. He also felt that the chair leg discovered in apartment 22, if used as a striking instrument, was consistent with some of the injuries. On cross-examination, Dr. Curtis acknowledged that other similar shoes or objects could have been used to inflict death.

Boston police officer William Charbonnier, an evidence technician of six months experience at the time he investigated the scene of the crime and the objects discovered there, also testified for the Commonwealth. So did Paul R. Bidez, an F. B. I. agent who analyzed some of the evidence in Washington. Charbonnier testified that he had made visual observations and performed benzidine tests on the boots identified as belonging to Lussier. The right boot proved positive for blood in the area where the heel and leather parts joined and on the inside of the strap. The subsequent F. B. I. analysis determined the blood to be "O positive." The benzidine test on the left boot also proved positive, but the amount of blood was insufficient to allow for blood grouping. On the right boot, Charbonnier had initially detected a pattern of bloodstaining which he characterized as "directional," consisting of stains in an upward and rearward direction, as if the boot had been wiped off, but by the time of trial he was no longer able positively to identify such a pattern. Continuing in his testimony concerning the boots, Charbonnier stated that he had taken a footwear impression from the blood soaked carpet near the victim's body on the

night of his initial investigation. He had observed that the impression on the carpet was similar in dimension to the heel of the defendant's boots. The F. B. I. report proved the blood to be "O positive," but by the time of trial, the impression had become diffused to the point where scientific matching with Lussier's boot was impossible.

Charbonnier also gave the details of his analysis of other evidence used by the police to connect Lussier to the crime. Human blood was found on the left cuff of Lussier's purple and white striped shirt, on the left knee of his dungarees, and in the mouth of the figure of the head of a cat on his ring. However, because the amounts of blood were insufficient, the F. B. I. was unable to determine the blood type. But "O positive" blood was found on the toilet tissue discovered by Officer Charbonnier behind the toilet in apartment 22.

On this evidence, the jury returned a verdict against Lussier of first degree murder committed with extreme atrocity or cruelty. The defendant asserts that this was error as a matter of law, and that he was entitled to a directed verdict. The argument is that, assuming all the facts in evidence to be true, reasonable inferences equally support the defendant's innocence as they do his guilt, and thus the conviction must be overturned because "[w]hen the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof." *Commonwealth* v. *Carter,* 306 Mass. 141, 147 (1940). See *Commonwealth* v. *Cooper,* 264 Mass. 368, 373 (1928), and *Commonwealth* v. *Shea,* 324 Mass. 710, 713-714 (1949). We disagree. Instead, we think that another well established principle governs the disposition of this case: "A jury may find a crime proved beyond a reasonable doubt even though the inference of guilt from the facts established is not inescapable or necessary." *Commonwealth* v. *Ehrlich,* 308 Mass. 498, 500 (1941). "It is enough if the inferences drawn from the circumstances be reasonable and possible." *Commonwealth* v. *Medeiros,* 354 Mass. 193, 197 (1968).

The evidence clearly gives rise to "reasonable and possible" inferences supportive of the jury's verdict. Testimony

indicated that Lussier and the victim left the party holding hands about 2 A.M. on October 31. While Lussier denied this in his statement to the police, a number of factors warranted a jury finding that the identifying witness was not mistaken. Lussier, without a costume at a costume party, was relatively conspicuous. The witness Fricke, who said he saw Lussier leave with the victim, had earlier spoken with Lussier in a group for at least fifteen minutes and thus was not likely to have so soon thereafter forgotten his appearance. Other witnesses had seen the two holding hands, a fact which further supports the likelihood that the couple eventually left the party together. And while these facts do not conclusively establish that Lussier and only Lussier could have been alone with the victim in apartment 22, "[i]t is not necessary to prove that no one other than the accused could have done the act. . . . That another might have had the opportunity to do the act goes only to the weight of the evidence." *Commonwealth* v. *Medeiros, supra,* at 197.

The next link in the chain of circumstantial evidence, that Lussier committed the murder in apartment 22 between 2 and 2:30 A.M., can also be reasonably inferred from the testimony of a number of witnesses. Both Miss Klein and her roommate Kathleen Bahm testified to hearing a "loud thud" and more than one person running around in that apartment at approximately 2:15 A.M. That this testimony was correct is even more likely in light of the fact that Miss Klein discovered the victim's body in the approximate location from which the "thud" emanated. And finally, since Lussier had cleaned up apartment 22 two days earlier, and therefore knew it was vacant, it was reasonable for the jury to infer that he would have considered the apartment to be a relatively safe place to commit his crime.

The physical evidence, while not conclusive, also points convincingly to the defendant's guilt. Lussier maintains that the bloodstains found on his clothing and boots are as consistent with his association with Devereaux as they are with his assaulting and murdering the victim. We believe, however, that the jury were justified in concluding otherwise.

There was no evidence that Lussier did, in fact, have actual contact with Devereaux or that Devereaux's blood came onto Lussier's person or clothing. Nor was there a positive showing that Devereaux's blood ever spilled onto the floor, thus leaving the jury without a satisfactory alternative explanation for the O positive blood found on the lower portions of Lussier's boot. That the bloodstains were connected with Lussier's presence in apartment 22 is made more plausible by Officer Charbonnier's testimony that he had initially detected a close similarity between Lussier's boot heel and the blood impression in the area of the carpet next to the victim's body. The fact that by the time of trial the impression was no longer clearly visible goes only to the weight of that testimony and does not necessarily discredit it.

The same may be said of Officer Charbonnier's initial observations of "directional" staining on Lussier's boot, a fact which when considered with the O positive bloodstained toilet tissue found in apartment 22, permits an inference that Lussier used the toilet tissue to wipe his shoes and points to Lussier's presence at the scene of the crime. Along with Dr. Curtis's testimony that the victim's fatal injuries were consistent with kicking and stomping by boots of the type worn by Lussier, this evidence is more than sufficient to establish a "reasonable and possible" inference that at least a large portion, if not all, of the blood detected on the boots and other articles of clothing was the victim's and not Devereaux's.

We conclude, therefore, that, giving consideration to all the evidence and reasonable inferences to be drawn therefrom, it was sufficient to support the jury's conclusion that the defendant was guilty beyond a reasonable doubt.

We now turn to questions raised by the defendant concerning the constitutionality of the Commonwealth's jury selection process, the propriety of certain of the prosecutor's remarks in his summation argument to the jury, and the failure of the trial judge to require the Commonwealth to elect among its theories of murder and to prevent inquiries of and eventual dismissal of prospective jurors who were opposed to the death penalty.

We need not pause long in disposing of the defendant's contention that G. L. c. 234, § 1,[1] as amended, violates the Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution. The statute exempts from jury duty all persons under twenty-two years of age and, according to the defendant, in operation results in the exclusion of those under twenty-two and one-half and in the underrepresentation of those between twenty-two and one-half and twenty-four and one-half. Based on this analysis, and on the fact that he was twenty-four at the time of his arrest, the defendant makes two arguments: (1) he was deprived of his Due Process right to an impartial jury because persons within his age class and with similar backgrounds and outlooks were excluded from his jury, and (2) the statute on its face violates the Equal Protection clause because it arbitrarily discriminates against younger persons.

Recently, in *Commonwealth* v. *Therrien*, 359 Mass. 500, 507, we said in reference to an identical challenge to an earlier version of G. L. c. 234, § 1, which then exempted persons under twenty-five from jury service, "[the] argument that exclusion of those persons under twenty-five years of age from the jury panel was prejudicial to him requires no discussion. *King* v. *United States*, 346 F. 2d 123, 124 (1st. Cir.). See *Commonwealth* v. *Slaney*, 350 Mass. 400, 401-

---

[1] "*Section 1.* A person of either sex qualified to vote for representatives to the general court, whether a registered voter or not, shall be liable to serve as a juror, except that the following persons shall be exempt: The governor; lieutenant governor; members of the council; state secretary; members and officers of the senate and house of representatives during a session of the general court; judges and justices of a court; county commissioners; clerks of courts and assistant clerks and all regularly appointed officers of the courts of the United States and of the Commonwealth; registers of probate and insolvency; registers of deeds; sheriffs and their deputies; constables; marshals of the United States and their deputies; and all other officers of the United States; attorneys at law; settled ministers of the gospel; officers of colleges; preceptors and teachers of incorporated academies; registered practicing physicians and surgeons; persons over seventy years of age; persons under twenty-two years of age; superintendents, officers and assistants employed in or about a state hospital, insane hospital, jail, house of correction, state industrial school or state prison; teachers in public schools; enginemen and members of the fire department of Boston, and of other cities and towns in which such exemption has been made by vote of the city council or the inhabitants of the town; Christian Science practitioners and readers, respectively; trained nurses; assistants in hospitals; attendant nurses; mothers of children under sixteen years of age or women having custody of such children and women members of religious orders."

Commonwealth *v.* Lussier.

402." We perceive no reason why we should treat the defend-
ant's argument any differently today.[2]

Next, the defendant characterizes certain remarks made by
the prosecutor in his closing argument as improper and chal-
lenges the failure of the trial judge to order the remarks
struck when they were made, or subsequently to instruct the
jury to disregard them. We have fully and carefully exam-
ined the record in this case. While we do not approve of
some portions of the prosecutor's summation to the jury,[3]
when viewed in the overall context they are not so prejudicial
as to justify reversal. Compare, e.g., *Commonwealth* v.
*De Christoforo,* 360 Mass. 531, 544 (1971) (Tauro, C.J.,
dissenting). Moreover, there is a simple and obvious reason
for the trial judge's alleged "failure" to strike them or at-
tempt to mitigate their impact as effectively as the defend-
ant now argues was appropriate. That is, defence counsel
took no exceptions at the close of the prosecutor's summa-
tion, and made no request for special instructions despite
ample opportunity to do so (the judge did not charge the jury
until the next morning). At the end of the charge to the jury,
defence counsel asked for further explanation on one point,
and when the explanation was completed, he indicated no

---

[2]Many other courts have been asked to recognize "young persons" as a distinct
group for purposes of determining whether a jury panel includes a fair cross-section
of the community, and have declined to do so. See, e.g., *King* v. *United States,* 346
F. 2d 123 (1st Cir. 1965) (21-25 year olds); *United States* v. *Ross,* 468 F. 2d 1213 (9th
Cir. 1972) (21-24 year olds); *United States* v. *Olson,* 473 F. 2d. 686 (8th Cir. 1973)
(18-20 year olds). A recent First Circuit case, *United States* v. *Butera,* 420 F. 2d 564
(1970), arguably to the contrary, is clearly distinguishable. There the court was con-
cerned about the size of the excluded group, stating, "We cannot allow the require-
ment of a 'distinct' group to be applied so stringently with regard to age grouping
that possible discrimination against a large class of persons — in our case, those be-
tween 21 and 34 — will be insulated from attack." *Id.* p. 570. Furthermore, the
court in *Butera* found that the jury were properly drawn.

[3]THE PROSECUTOR: "I submit to you if [F. B. I.] Agent Bidez was the chemist on
the scene on the night in question, I submit to you you wouldn't be up in that jury
room more than two minutes deciding this case. But we are stuck with the evidence
we have to present to you." THE PROSECUTOR: "What did she [the victim] see in this
creepy-looking character?" THE PROSECUTOR: "I don't know how he got her down
there. There's only one person that could tell us that." This last remark would raise
serious questions as to the infringement of the defendant's Fifth Amendment right
to remain silent, see *Griffin* v. *California,* 380 U. S. 609, 611 (1965), were it not for
that portion of the judge's charge specifically explaining to the jury that the defend-
ant had the right not to testify, and that no unfavorable inferences were to be
drawn from his exercising that right.

Commonwealth *v.* Lussier.

further disagreement. While under G. L. c. 278, § 33E, we will, in appropriate circumstances, act to rectify a substantial risk of a miscarriage of justice, despite the absence of exceptions in the record, we do not feel that such action is warranted here. Compare *Commonwealth* v. *Freeman,* 352 Mass. 556, 563-564 (1967); *Commonwealth* v. *De Christoforo,* 360 Mass. 531, 544 (1971) (Tauro, C.J., dissenting).

The defendant's final argument is that in light of the recent decision of *Furman* v. *Georgia,* 408 U. S. 238 (1972), declaring the death penalty to be unconstitutional in certain situations, it was reversible error for the trial judge to question the jury panel concerning their views on the death penalty unless the prosecution restricted itself to a rape-murder theory. The contention is presumably based on the theory that even after the *Furman* case the death penalty could be constitutionally imposed for rape-murder, but it probably could not be imposed for other types of murder where the jury are vested with discretion in deciding on the appropriate penalty. Thus, the argument runs, the judge, by not forcing the Commonwealth to make this election, and by allowing inquiries, and eventual dismissal, of jurors who were opposed to the death penalty, unnecessarily deprived the defendant of "scrupled jurors" (see *Witherspoon* v. *Illinois,* 391 U. S. 510 [1968]) that he might have had on his jury if rape-murder were not going to be a basis of prosecution. We think this attenuated argument entirely misses the mark. In rejecting this contention, we need only repeat what the Supreme Court said in the *Witherspoon* case at 517-518: "We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction."

Pursuant to the requirements of c. 278, § 33E, we have reviewed the entire transcript and record and we found no reason either to order a new trial or to direct a verdict of a lesser degree of guilt.

*Judgment affirmed.*