COMMONWEALTH vs. RUSSELL G. LABBE.

Barnstable.   December 12, 1977. — February 28, 1978.

Present: HALE, C.J., ARMSTRONG, & BROWN, JJ.

*Homicide. Evidence*, Relevancy and materiality; Opinion: expert; Admissions and confessions. *Inquest. Witness*, Privilege. *Practice, Criminal*, Location of defendant in court room.

At a murder trial the defendant was not entitled to a directed verdict where there was evidence that the victim, the defendant's fifteen month old stepson, had suffered injuries inconsistent either with a fall or with injuries children could inflict on themselves, that the defendant had been with the victim during much of the period when the fatal injuries must have occurred, and that the defendant had been disposed to violence toward his stepson. [76]

At the trial of the defendant for the murder of his fifteen month old stepson, evidence of frequent injuries suffered by the child during the nine months preceding his death was admissible to show that someone in a custodial relation to the child bore him ill will. [76–77]

At the trial of an indictment for murder of a fifteen month old child there was no error in permitting a pathologist to give his expert opinion that the cause of death was "battered child syndrome." [77]

At a murder trial the judge did not abuse his discretion in admitting in evidence the entire testimony of the defendant at an inquest into the victim's death rather than only those portions which constituted admissions by the defendant. [78]

At a murder trial the judge was not required to exclude evidence of the defendant's prior testimony at an inquest into the victim's death simply because inquest procedure did not permit cross-examination of witnesses. [78–79]

Whether it is the interspousal privilege or the privilege against self-incrimination which is claimed by a witness at a criminal trial, if it is clear that a witness for the prosecution will, if called, exercise a privilege not to testify, the witness should not be called; alternatively, the questions which will cause the privilege to be exercised should not be put in the presence of the jury. [79–80]

In the circumstances there was not reversible error in the denial of the defendant's motion that the Commonwealth not be permitted to

call as a witness the defendant's wife, who had stated in an affida-
vit, filed with the defendant's motion, that she would exercise her
privilege not to testify against her husband. [80–81]

At the trial of the defendant for the murder of his fifteen month old
stepson, the judge did not abuse his discretion in refusing to permit
the defendant to sit with his family during trial, rather than alone
in the defendant's dock. [81]

At a murder trial the reference in the prosecutor's opening to psychia-
tric testimony which was never adduced was so vague and general
that the defendant could not have been prejudiced thereby. [81]

INDICTMENT found and returned in the Superior Court
on April 29, 1975.

The case was tried before *McLaughlin*, C.J.

*Joseph F. Flynn*, for the defendant.

· *Philip A. Rollins*, District Attorney *(Gary A. Nickerson*,
Assistant District Attorney, with him) for the Common-
wealth.

ARMSTRONG, J. The defendant was charged with the
murder of his fifteen month old stepson, and a jury found
him guilty of the lesser charge of manslaughter. He ap-
peals that conviction under G. L. c. 278, §§ 33A–33G.

The evidence most favorable to the Commonwealth in-
dicated that the stepson, Jason Goldings, was born July
28, 1973; that the birth was normal and the baby was
apparently healthy in every respect; and that he was seen
by a doctor six times in his first six and a half months for
well baby care during which time he exhibited no tenden-
cy towards traumatic injuries, easy bruising, or disease.
In late January, 1974, Jason's natural father moved out
of the home, and, on January 28, the defendant began
living with the mother, Jason, and Jason's older sister.
That evening Jason was taken to a hospital emergency
room suffering from a dislocated arm, a condition usually
caused by a sudden yanking. On several occasions there-
after the defendant was seen to drop Jason or otherwise
handle him roughly, and on various occasions he made
statements exhibiting deep hostility and resentment to-
wards Jason. On various occasions in March, April and
May friends of the family observed that Jason had exten-

sive bruising and discoloration all over his body and head. On July 19 Jason was treated for a broken arm, estimated to be a week or so old. The break was attributed to a fall, but was of a type which the treating physician said was more likely to have been caused by a sharp blow. In August the family stayed with a friend of the mother, who observed bruises and discoloration all over Jason's body and discussed the matter with the mother. During that stay the friend saw the defendant dropping the child roughly, apparently in anger, and he repeatedly expressed hostility towards Jason and complained of the aggravation to which he was put because of Jason. In late August Jason was taken to the emergency room with a cut tongue. The doctor also noted an unexplained contusion on his face and neck. On September 25 Jason was taken to the emergency room with a sore arm, variously attributed by the defendant and Jason's mother to a yank by his four year old sister or to a fall. On September 26 Jason was again taken to the emergency room, this time with a bleeding, lacerated lip. He also had bruises (which had not been noted the previous day) on his forehead, ear, chin, and abdomen. The defendant, who had been alone with Jason when he injured his lip, stated that it had been caused by a fall in his playpen. The attending physician asked a visiting nurses association to visit the home and look into the cause of Jason's frequent injuries.

On the afternoon of October 29 the mother went shopping and Jason was left in his crib in the care of the defendant. When the mother returned home Jason was unable to sit normally, falling forward and backward. He had difficulty breathing. Later, she found him not breathing and rushed him to the hospital, where he was pronounced dead on arrival. Pictures of Jason taken at the time show heavy bruising over his face, head and neck. An autopsy revealed three lacerations of his liver, which could only have been caused by strong, direct force, and were inconsistent with a fall or injuries children could inflict on themselves or on each other. The time of the

fatal liver injuries was estimated to be when the defendant was alone with Jason. Dr. Bigelow, who performed the autopsy, testified that in his opinion the injuries were the result of "battered child syndrome," which he defined as "a young infant or child [being] subjected to repeated episodes of trauma, violence by an older person which, after sufficient length of time, leads to severe medical injury and often ultimate death."

The defendant argues that the judge erred in refusing to allow his motion for a directed verdict, first, because there was no direct evidence of the defendant's having struck Jason either on October 29 or previously, and, second, because the evidence was equally consistent with other causes of the fatal injury to the liver on October 29, such as a fall from a height against a sharp object or accidental injury during the defendant's own attempts to revive Jason after he was discovered not breathing. Neither point has merit. The law does not require that a crime be proved only by the testimony of one who witnessed it; circumstantial evidence must necessarily suffice in many cases. *Commonwealth* v. *Montecalvo*, 367 Mass. 46, 54–55 (1975). Nor must the evidence preclude the possibility of any other explanation. *Commonwealth* v. *Lussier*, 364 Mass. 414, 420 (1973). The case relied on by the defendant, *Commonwealth* v. *Curtis*, 318 Mass. 584 (1945), is not in point. There, it was held that the evidence established nothing more than opportunity. Here there was evidence that the defendant had been alone with Jason during much of the period of time when, according to medical testimony, the fatal injuries must have been inflicted. There was further evidence that he had been disposed to violence towards Jason from the day he moved into the house.

The evidence of Jason's frequent injuries prior to October 29 was admissible to show that someone in a custodial relation to Jason bore him ill will. *Commonwealth* v. *Holmes*, 157 Mass. 233, 239–240 (1892). *Commonwealth* v. *Bartolini*, 299 Mass. 503, 510–511, cert. denied, 304 U.S.

565 (1938). *Commonwealth* v. *Cutler,* 356 Mass. 245, 247–249 (1969). Contrast *Commonwealth* v. *Welcome,* 348 Mass. 68, 70–71 (1964). No limiting instructions were requested. See *Commonwealth* v. *Bartolini, supra; Commonwealth* v. *Rawlins,* 352 Mass. 293, 297 (1967). The earliest of the prior injuries cannot be said as matter of law to have been too remote in time to have a rational bearing on the defendant's state of mind on the day of the fatal injury. *Commonwealth* v. *Holmes, supra* at 240.

There was no error in permitting the pathologist to give his expert opinion that the cause of death was battered child syndrome. That syndrome has come to be a well recognized medical diagnosis,[1] dependent on inferences, not a matter of common knowledge, but within the area of expertise of physicians whose familiarity with numerous instances of injuries accidently caused qualifies them to express with reasonable probability that a particular injury or group of injuries is not accidental or is not consistent with the explanation offered therefor but is instead the result of physical abuse by a person of mature strength. Compare *Commonwealth* v. *Boudreau,* 362 Mass. 378, 380–381 (1972). Expert testimony that a child was a victim of battered child syndrome has been held admissible in *People* v. *Jackson,* 18 Cal. App. 3d 504, 507–508 (1971); *People* v. *Henson,* 33 N.Y.2d 63, 73–74 (1973); *State* v. *Goblirsch,* 309 Minn. 401, 406 (1976). The appellate records in *Commonwealth* v. *Cutler,* 356 Mass. 245 (1969), show that such an opinion was put in evidence in that case without objection.[2]

---

[1] It has been discussed in *Commonwealth* v. *Cutler,* 356 Mass. 245, 247, 248 (1969), and *Commonwealth* v. *Cadwell,* 374 Mass. 308, 316-318 (1978).

[2] It is unnecessary to deal with questions presented by a definition of "battered child syndrome" adopted by another witness and mentioned by the district attorney in closing argument. The definition included the thought that the battery was usually performed by a parent or stepparent. No objection or motion to strike was made by the defendant on either occasion.

The trial judge permitted the district attorney to introduce in evidence, as part of the Commonwealth's case in chief, the defendant's testimony at an inquest into Jason's death which was held pursuant to G. L. c. 38, § 8, as in effect prior to St. 1975, c. 490, § 1. The transcript was not introduced as an exhibit; rather, the district attorney read the questions and an assistant district attorney read the answers. Compare *Williams* v. *Meachum*, 382 F. Supp. 521, 524–525 (D. Mass. 1974). No question was or is raised as to the accuracy of the transcript or demeanor of those doing the reading.

The defendant recognizes that portions of his testimony at the inquest could be introduced in evidence as admissions or for purposes of impeachment. See *Kennedy* v. *District Court of Dukes County*, 356 Mass. 367, 374 (1969). His objection is that the entire testimony was permitted to come in, rather than only those portions which could be specifically identified as admissions. As a general proposition the defendant's position is probably sound. See *Chase* v. *Chase*, 271 Mass. 485, 490 (1930). But in this case the testimony in question, not particularly long (roughly twenty pages of trial transcript), is interspersed with statements which could reasonably be permitted to come in as admissions, and the remainder might well be thought necessary to establish the context in which the admissions were made. It was thus within the judge's discretion to admit the entire statement. The material which could not be categorized as admissions was harmless in any event.[3]

The defendant argues that his testimony at the inquest should not have been received in evidence because the inquest procedure did not permit cross-examination of witnesses. He relies on *Pointer* v. *Texas*, 380 U.S. 400, 407 (1965). See *Commonwealth* v. *Mustone*, 353 Mass. 490,

---

[3] An exception is that portion of the inquest testimony which was in response to questions by the inquest judge. The trial judge offered to exclude that portion, but the defendant declined the offer.

492–493 (1968), and *Commonwealth* v. *Canon*, 373 Mass. 494, 499–501 (1977), and also 507–513 (dissenting opinion of Liacos, J.). The principle of those cases seems to us to have no application to the introduction in evidence of the defendant's own prior testimony. In this situation, the principal concern must be the voluntariness of the defendant's earlier testimony. Leach & Liacos, Massachusetts Evidence 230–231 (4th ed. 1967). No viable question of voluntariness arises in this case, the defendant having been represented by trial counsel at the inquest and having been apprised of his right against self-incrimination.

The defendant filed a motion before trial that the Commonwealth not be permitted to call as a witness the defendant's wife (i.e., Jason's mother—they were married in late October, 1974, apparently just after a final decree of divorce was obtained by Jason's father). The motion was accompanied by an affidavit of Jason's mother in which she stated under oath that she was the defendant's wife and would exercise her privilege under G. L. c. 233, § 20, Second, to decline to testify against her husband. The judge denied the motion before trial, apparently for two reasons: first, the district attorney represented at that time that he did not intend to call Jason's mother as a witness; and, second, the judge felt that the preferable procedure would be to have her invoke her privilege on the witness stand, before the jury, in response to specific questions. The latter may have been an improper ground for the ruling. See McCormick, Evidence § 66 n.47 (2d ed. 1972). A recent case, *Commonwealth* v. *Martin*, 372 Mass. 412, 421 n.17 (1977), indicates that, where it is clearly known in advance that a witness will exercise a privilege not to testify, he should not be put in the position of having to exercise the privilege before the jury, lest they draw inferences adverse to the party against whom the witness is called to testify. More recently, in *Commonwealth* v. *DiPietro*, 373 Mass. 369, 388–391 (1977), the question was dealt with in some detail, in the specific

context of the interspousal privilege (the *Martin* case involved an exercise of the Fifth Amendment privilege by a witness called for the prosecution). In the *DiPietro* case, the judge's ruling permitting the Commonwealth to call the defendant's spouse was sustained on two bases, neither of which is applicable here: first, the judge was not required to accept the assertion of defense counsel that the spouse would exercise her privilege, particularly because the privilege was personal to the witness, not the defendant; and second, the Commonwealth had to show the unavailability of the spouse's testimony in order to lay a foundation for the admissibility of her prior testimony, and the jury were entitled to know "why [the Commonwealth] was introducing the transcript of [the spouse's] prior testimony when she was in fact present in court." (The *DiPietro* case at 390.) Nothing in the *DiPietro* case seems to us to justify the Commonwealth's contention that the interspousal privilege is governed by a different rule from that stated in the *Martin* case. Whether it is the interspousal privilege or the privilege against self-incrimination which is claimed, if it is clear that a witness for the prosecution will, if called, exercise a privilege not to testify, the witness should not be called or, alternatively, the questions which will cause the privilege to be exercised should not be put in the presence of the jury.

In this case, however, the judge was justified in denying the defendant's motion as unnecessary on the alternate ground that the Commonwealth did not intend to call the defendant's wife. When, at a later point, the Commonwealth decided to call the wife, no objection was made, and the original motion was not renewed. After the wife first asserted the privilege, the judge inquired to establish whether she would do so in all instances, and then he excused her as a witness. He immediately instructed the jury forcefully and fully that they should draw no adverse inferences from her exercise of the privilege. There is nothing in the record of this case which would justify our

concluding that the prosecution made "a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege" (*Namet* v. *United States*, 373 U.S. 179, 186 [1963]; *Commonwealth* v. *Martino*, 361 Mass. 720, 722 [1972]), and this is not a case in which "insistent or extended [questioning] . . . suggest[ed] particularized states of fact from which the jury might the more easily draw harmful inferences." *Commonwealth* v. *Martin*, 372 Mass. at 421. In light of all these circumstances, coupled with the judge's forceful cautionary instructions, we conclude that, if there was error, it was not such as to require reversal.

The defendant's contention that he should have been permitted to sit with his family during the trial, rather than alone in the defendant's dock, obviously raises a matter in which the trial judge was called upon to exercise his sound discretion. See *Commonwealth* v. *Jones*, 362 Mass. 497, 501 (1972); *Commonwealth* v. *MacDonald (No. 2)*, 368 Mass. 403, 409 (1975); *Commonwealth* v. *Magnasco*, 4 Mass. App. Ct. 144, 148 (1976). There is no showing of any abuse of that discretion.

The reference in the Commonwealth's opening to psychiatric testimony which was never adduced was so vague and general that it cannot reasonably be contended that the defendant was prejudiced thereby.

We have considered the other assignments argued by the defendant and find them to be without merit.

*Judgment affirmed.*

BROWN, J. (concurring). I fully concur in the opinion of the court affirming the verdict of manslaughter. I note, however, that, most regrettably, none of the doctors or other persons involved in treating Jason on his several visits to the hospital emergency rooms between January and September, 1974, reported the possibility of abuse to the Department of Public Welfare as required by G. L.

c. 119, § 51A.[1] Such a report could possibly have saved Jason's life.

A cause of action may lie in tort on behalf of a battered child against persons named in the statute for failure to report a probable case of child abuse, where subsequently there is further injury to the child. See *Commonwealth* v. *Cadwell,* 374 Mass. 308, 319 n.8 (1978). In addition, an attending physician may be subject to personal liability for the consequences of any negligent failure to recognize the battered child syndrome. See *Landeros* v. *Flood,* 17 Cal. 3d 399, 408–412 (1976).

———

[1] The attending physician on September 26, 1974, did ask the visiting nurses association to visit the home and look into the cause of Jason's frequent injuries.