Russell G. LABBE, Sr., Petitioner,
Appellant,

v.

Louis M. BERMAN, etc., Respondent,
Appellee.

No. 79–1529.

United States Court of Appeals,
First Circuit.

Argued March 10, 1980.
Decided May 12, 1980.

---

Mark Schonfeld, Boston, Mass., by appointment of the Court, with whom Sherburne, Powers & Needham, Boston, Mass., was on brief, for petitioner, appellant.

Roberta Thomas Brown, Asst. Atty. Gen., Crim. Bureau, Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., and Stephen R. Delinsky, Asst. Atty. Gen., Chief, Crim. Bureau, Boston, Mass., were on brief, for respondent, appellee.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, and WYZANSKI,* Senior District Judge.

LEVIN H. CAMPBELL, Circuit Judge.

Petitioner, convicted in a Massachusetts state court of the manslaughter of his stepchild, Jason Golding, appeals from the denial of his petition for habeas corpus. Petitioner argues his constitutional rights were violated by (1) his wife's claiming the marital privilege in the presence of the jury, (2) the court's refusal to allow his wife and parents to sit with petitioner during the trial, (3) the introduction into evidence of his inquest testimony, and (4) the introduction of Jason's injuries prior to his date of death. The evidence is described in the opinion of the Massachusetts Appeals court affirming petitioner's conviction. *Common-* *wealth v. Labbe,* —— Mass.App. ——, 373 N.E.2d 227.

### 1. Marital Privilege

Prior to trial, petitioner filed a motion *in limine* to restrain the prosecutor from calling petitioner's wife, Penny Labbe, as a witness, and Penny Labbe filed an affidavit stating that if called, she would exercise her statutory[1] privilege not to testify. The prosecutor represented he did not intend to call the wife or to comment on her exercise of the spousal privilege. In support of his motion *in limine,* petitioner argued to the Superior Court that just as the Commonwealth is not permitted to call a criminal defendant to the stand and require him to claim his fifth amendment privilege in front of the jury, so should the Commonwealth be precluded from forcing a spouse to exercise the marital privilege in the jury's presence. While the court apparently viewed the motion as somewhat moot in light of the prosecutor's representations, it nonetheless rejected petitioner's argument that it would be improper for the prosecutor to call Mrs. Labbe and denied the motion.[2] Several days later, the prosecutor did call Mrs. Labbe as a witness. Petitioner did not object at that time or request a voir dire. After being identified as petitioner's wife, she invoked the privilege and was excused as a witness. The court then explained to the jury the rationale for the privilege and instructed its members at some length that no inferences were to be drawn from Mrs. Labbe's exercise of it. Petitioner did not object to the instruction.

An accused has no federal constitutional right to bar a spouse from testifying at his trial, *see Trammel v. United States,* —— U.S. ——, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980), and no constitutional right of petitioner's was violated by the

---

* Of the District of Massachusetts, sitting by designation.

1. Mass.Gen. Laws c. 233, § 20 provides

   "Except as otherwise provided . . . neither husband nor wife shall be compelled to testify in the trial of an indictment, complaint or other criminal proceeding against the other."

2. The court stated, "If anyone is going to claim a privilege, they are going to claim it under oath on the stand," and the court told the prosecutor he could call Mrs. Labbe as a witness.

mode in which his spouse asserted her[3] privilege not to testify at petitioner's trial. While federal courts in cases decided when an accused had a privilege to preclude his spouse from testifying have stated that an opportunity should be afforded for the spousal privilege to be claimed in the absence of a jury, *Melton v. United States*, 398 F.2d 321, 322 (10th Cir. 1968); *Tallo v. United States*, 344 F.2d 467, 469 (1st Cir. 1965); *San Fratello v. United States*, 343 F.2d 711 (5th Cir. 1965), and this apparently is the Massachusetts rule, *Commonwealth v. Labbe*, 373 N.E.2d at 232; *Commonwealth v. Stokes*, 374 Mass. 583, 374 N.E.2d 87, 96 n. 9, we do not see that this procedure is constitutionally mandated. To be sure, there are situations where a prosecutor's questioning of a witness knowing the witness will decline to answer and will assert a privilege may be improper. This may be so when the prosecutor "makes a conscious and flagrant attempt to build its case out of inferences arising from [the] use of the testimonial privilege" or where the "inferences from a witness' refusal to answer [add] critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly [prejudice] the defendant." *Namet v. United States*, 373 U.S. 179, 186–87, 83 S.Ct. 1151, 1154–1155, 10 L.Ed.2d 278 (1963); *Douglas v. Alabama*, 380 U.S. 415, 420, 85 S.Ct. 1074, 1077, 13 L.Ed.2d 934 (1965). Neither condition is present here. There was no prosecutorial misconduct here which amounted to a denial of due process. The prosecutor had been instructed by the court, erroneously as it turned out, that he could call Mrs. Labbe and have her claim the privilege on the stand, and he did so. Nor did any materially adverse inferences flow from Mrs. Labbe's refusal to answer the one relatively innocuous question posed before she was excused as a witness.[4] We will not assume the jury disregarded the court's prompt and explicit instruction to draw no inference adverse to petitioner from his wife's exercise of her right not to testify at trial. *Cf. United States v. Watson*, 591 F.2d 1058, 1062 (5th Cir.), *cert. denied*, 441 U.S. 965, 99 S.Ct. 2414, 60 L.Ed.2d 1070 (1979) (prompt instruction cured any prejudice which might have resulted from witness's invocation of fifth amendment). This is not a case, such as *Robbins v. Small, III*, 371 F.2d 793 (1st Cir. 1967), on which petitioner relies, where the prosecutor persisted in asking a number of detailed leading questions to a witness who had, early on, invoked the fifth amendment.

## 2. Courtroom Seating Arrangements

Petitioner also claims his constitutional rights were violated by the denial of his motion to allow his family to sit with him during the trial.

As an exception to the sequestration order petitioner had requested, the court ruled that petitioner's wife and parents could remain in the courtroom but were not to sit either on the customary bench where defendant sits nor directly behind. Petitioner argues the physical separation in the courtroom between his family and him may have led the jury to believe there was an emotional separation between them stemming from the alleged killing and that this belief undermined the presumption of innocence. This supposed inference seems remote at best given petitioner's continued relationship with his wife, of which the jury was informed,[5] and his parents' testimony in his behalf. The seating arrangement was, in any event, a matter largely within the trial court's discretion. *Commonwealth v. MacDonald*, 368 Mass. 403, 409, 333 N.E.2d 194 (1975), and we can see no possible deprivation of constitutional rights here.

3. Under Massachusetts law, the privilege belongs to the witness spouse, not to the accused, and the accused has no standing to assert error in the court's admission of the privileged testimony. *Commonwealth v. Stokes*, 374 Mass. 583, 374 N.E.2d 87, 96 (1978).

4. Mrs. Labbe was asked whether she had taken Jason to a doctor on July 19, 1974, a date more than three months prior to Jason's death.

5. Petitioner testified he currently resided with his wife.

### 3. Inquest Testimony

Next petitioner argues that because the Commonwealth did not warn him of his *Miranda* rights before he testified at an inquest, admission at trial of his inquest testimony violated his fifth amendment privilege against self-incrimination.

The inquest, held pursuant to Mass.Gen. Laws c. 38, § 8 before a state district court judge, commenced on January 8, 1975, slightly more than two months after Jason's death. At that time, no criminal process of any kind had issued against petitioner. Petitioner was summonsed to testify and appeared with counsel. His counsel advised him of his privilege against self-incrimination and told him that if he did testify, "anything he said might be used against him in a future court proceeding, if there were any, to impeach his testimony; that, if he testified in a future court proceeding and took the stand, then someone might be able to take what he said on that occasion and question him on it"; and "that any statement . . . in the nature of an admission or a confession might also be admissible against him in any future proceeding." The trial court concluded that a "full and complete disclosure [to petitioner] of all of his possible rights" had been made, that petitioner "voluntarily elected to take the witness stand [at the inquest]," and that "his conduct in testifying [was] completely voluntary."[6]

■■■ *Miranda* warnings were not required. *Compare United States v. Mandujano*, 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976) (plurality opinion) (failure to give *Miranda* warnings to grand jury witness called to testify about criminal activities in which he may have been personally involved does not require suppression, in perjury prosecution, of statement made). The *Miranda* decision was addressed to "extrajudicial confessions or admissions procured in a hostile, unfamiliar environment which lacked procedural safeguards," and the warnings prescribed were "to negate the 'compulsion' thought to be inherent in police station interrogation." *Id.*, 579, 96 S.Ct. at 1778. Neither the terms of the decision nor its rationale extends to an official investigation conducted in a judicial setting of the sort here involved. *See id.*, 579–80, 96 S.Ct. 1777–78. We conclude the Commonwealth's failure to administer *Miranda* warnings did not render petitioner's inquest testimony inadmissible.

Questioning at the inquest was conducted by the district attorney and the court. Counsel was not allowed to cross-examine petitioner and thereby to draw out petitioner's version of events. Petitioner argues that the introduction of his inquest testimony in effect forced him to forego his fifth amendment privilege at trial in order to explain his inquest testimony. We disagree. An admission of a criminal defendant is generally admissible into evidence if not extracted in violation of a constitutional guarantee. *See* Fed.R.Evid. 801(d)(2); 4 Weinstein & Berger, Evidence 801–139 (1979). We see nothing unique about petitioner's admission which requires departure from the general rule. At the inquest, petitioner was not badgered, subjected to trick questions, or precluded from explaining his answers.[7] Here, as is generally the case, petitioner could have let the statement stand without further explanation, attempted to elaborate upon or explain the admission through the testimony of other witnesses or evidence, or taken the stand himself. Petitioner was presented with a choice of trial tactics; he was not compelled to waive his fifth amendment privilege.

### 4. Evidence of Jason's Other Injuries

Last, petitioner argues the admission of testimony concerning injuries Jason suf-

---

6. Given counsel's testimony as to informing petitioner of his rights and the court's findings, we see no merit in petitioner's claim that his attorney told him only that his inquest testimony could be used for impeachment and that he therefore did not realize it could be used substantively against him.

7. Only twice did the district attorney interrupt petitioner and ask him to answer a particular question yes or no.

fered prior to his death was error amounting to a denial of due process. Various witnesses, lay and expert, testified to observing bruises on and injuries to Jason's body during the approximately nine month period prior to his death while petitioner was living in the same household. There was some evidence from which the jury could conclude the injuries commenced on or about the very day petitioner moved in. While some of the witnesses had actually observed petitioner handling Jason in a rough or reckless manner, for example, intentionally dropping him from a height of two to three feet into his playpen, or had heard petitioner express his hostility toward Jason, others testified only to the marks they saw on Jason's body, and direct evidence linking petitioner to each and every bruise observed was not presented.

■ As the Massachusetts Appeals Court stated in affirming petitioner's conviction, "[t]he evidence of Jason's frequent injuries prior to October 29. [the date of his death] was admissible to show that someone in a custodial relation to Jason bore him ill will." *Commonwealth v. Labbe*, 373 N.E.2d at 230. That petitioner was the one could be inferred from his hostility toward Jason as testified to by several witnesses. Petitioner argues some of the bruises and events testified to were too remote in time from the date of death to be relevant. Whether the events were too remote to bear on petitioner's attitude toward Jason at the time of his death was a question which is generally left to the discretion of the trial court, 2 Wigmore, Evidence 349–50 (3d ed. 1940), and we see no abuse of discretion here, let alone one of constitutional dimension.

*Affirmed.*